Bryan Hurlbutt (ISB #8501)
Laurence ("Laird") J. Lucas (ISB #4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IDAHO CONSERVATION LEAGUE | ) | No. 1:21-cv-504 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| U.S. FOREST SERVICE, and | ) | |
| U.S. FISH AND WILDLIFE | ) | |
| SERVICE, | ) | |
| | ) | |
| *Defendants*. | ) | |

## NATURE OF THE ACTION

1.     This action challenges Defendants' approval of the "Sage Hen Integrated Restoration Project"—a twenty-year, landscape-scale project that includes extensive logging, prescribed burns, and road construction on public lands in the Boise National Forest—for violations of the National Environmental Policy Act (NEPA), National Forest Management Act (NFMA), Endangered Species Act (ESA), and Administrative Procedure Act (APA).

2.     The Sage Hen Project area covers 67,800 acres in the West Mountains, west/northwest of Smith Ferry, Idaho, as shown in Figure 1 below.

**Fig. 1 – Sage Hen Vicinity Map**
(reproduction of Fig. 1 in the Forest Service's Environmental Assessment)



3.      The Project area includes Sage Hen Reservoir, parts of the Snowbank Mountain Inventoried Roadless Area, and multiple tributaries to Squaw Creek[1], a tributary to the Payette River. The Project includes 19,900 acres of commercial timber harvest, 11,200 acres of fuels reduction, 35,000 to 45,000 acres of prescribed burning, and up to 83.1 miles of road construction over the next twenty years.

4.      Plaintiff Idaho Conservation League (ICL) is the largest state-based conservation group in Idaho. ICL is also a founding member of the Boise Forest Coalition, which is a citizen-led coalition formed in 2010 to bring together diverse interests to craft recommendations for forest restoration projects in the Boise National Forest. Through its involvement in the Boise Forest Coalition and other similar groups, ICL regularly partners with the U.S. Forest Service, local governments, communities, and other stakeholders to support well-planned forest restoration projects on National Forest lands. Both ICL and the Boise Forest Coalition filed objections critical of the Sage Hen Project, and neither objection was resolved.

5.      Unlike other forest projects ICL has supported, the Forest Service rushed the Sage Hen Project to approval, cut out the public, failed to consider alternatives, refused to prepare an Environmental Impact Statement, and deferred analyzing important effects to fish, plants, and wildlife until after the Project is underway, in violation of the core tenets of NEPA.

6.      Not only does this "approve first, study later" approach violate NEPA, but it also violates NFMA because the Forest Service failed to follow the Forest Plan for the Boise National Forest, which requires surveying and developing protections for "sensitive species" of wildlife, plants, and their habitat during project planning, not after project approval.

---

[1] In November 2021, Secretary of the Interior Haaland formally declared "squaw" to be a derogatory term and ordered a task force to find replacement names for sites on federal lands that use the term. Hereafter, the Complaint avoids using the term when possible.

7.     Many of these errors flow from the Forest Service's decision to do as little up-front planning as possible by using "conditions-based management" for the Sage Hen Project. Under this approach, the Forest Service set maximum amounts of logging, road work, and other activities now but gave itself a blank check to decide later—outside of the pre-decisional and public NEPA process—the specifics of when, where, and how to conduct Project activities. As a result, important details of the Project are largely unknown, and the true extent of its adverse environmental impacts are highly uncertain.

8.     Because the Sage Hen Project is so large in scale and duration, the maximum authorized logging and road construction will likely have significant adverse impacts on the area's fish, wildlife, and plants. But the Forest Service ignored and downplayed these effects and erroneously concluded there will be no significant environmental effects, again violating NEPA.

9.     The Forest Service also violated the ESA by relying on a flawed Biological Opinion prepared by the U.S. Fish and Wildlife Service (FWS), which fails to protect "threatened" bull trout. Local bull trout are isolated, their population numbers are dangerously small, and they are particularly susceptible to further loss due to climate change. Yet the Forest Service and FWS ignored this and other important information to conclude—incorrectly—that harm and habitat degradation caused by the Project will have minimal effect on bull trout.

10.    Based on these and other violations of law, Plaintiff ICL requests that the Court hold unlawful, set aside, and vacate the Forest Service's approval of the Sage Hen Project, and FWS's Biological Opinion, and enter other relief as prayed for below.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this Court under 28 U.S.C. §§ 1346 and 1331 because this action involves the United States as a defendant and arises under the laws of the United States,

including NEPA, 42 U.S.C. § 4321 *et seq.*; NFMA, 16 U.S.C. § 1600 *et seq.*; the ESA, 16 U.S.C. § 1531 *et seq.*; the APA, 5 U.S.C. § 701 *et seq.* (APA); the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; the Equal Access to Justice Act, 28 U.S.C. §§ 2212, 2214; and applicable regulations.

12.     As required by the ESA, 16 U.S.C. § 1540(g)(2), Plaintiff provided notice of its intent to bring the ESA claims in this action to the U.S. Forest Service, FWS, and Secretary of the Interior more than 60 days prior to bringing this action.

13.     An actual, justiciable controversy exists between Plaintiff and Defendants. The requested relief is therefore proper under 5 U.S.C. §§ 701–706, 28 U.S.C. §§ 2201–2202, and 16 U.S.C. § 1540(g).

14.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 and 16 U.S.C. § 1540(g)(3)(A) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiff and Defendants are located in this district, and the public lands and resources in question are in this district.

15.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. §1540(g)(1).

## PARTIES

16.     Plaintiff IDAHO CONSERVATION LEAGUE is a non-profit conservation organization founded in 1973. ICL is based in Boise, Idaho, and has three field offices around the state, including one in McCall, Idaho. ICL works on behalf of over 35,000 members and supporters to protect public lands, water quality, fish, and wildlife throughout Idaho, including in the Boise National Forest.

17.     ICL staff, members, and supporters regularly visit, use, and enjoy the public lands and waters in the Boise National Forest, including in the Sage Hen Project area, for recreation, conservation, scientific, aesthetic, and other uses, and they will continue to do so in the future. ICL staff, members, and supporters observe, enjoy, use, and appreciate the native fish, wildlife, and plants in the Project area. These uses will be harmed or even eliminated by the logging and road construction and use, and other activities authorized by the Project, which will harm fish, wildlife, and plants and destroy and degrade their habitat.

18.     Moreover, Defendants' violations of law injure ICL and its staff, members, and supporters by denying them the ability to adequately participate in the public review process, failing to consider alternatives to the Project, and by denying them information concerning potential environmental impacts and other issues that NEPA requires the Forest Service to disclose, analyze, and seek public review of prior to authorizing the Project.

19.     ICL also suffers injury-in-fact because it has devoted time, energy, and money to protecting public lands, forests, fish, wildlife, and plants and advocating for responsible forest management in the Boise National Forest. ICL has diverted resources from other efforts to pursue its mission and has instead used those resources to conduct field visits, submit public comment to the Forest Service, file administrative objections, and engage with local, state, and federal officials about their concerns with the unlawfully-approved Sage Hen Project.

20.     Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States within the Department of Agriculture. The Forest Service is vested with the authority and duty to manage and protect the public lands and resources of the Boise National Forest. The Forest Service approved the Sage Hen Project in the April 2021 Decision Notice and based on its November 2020 EA/FONSI, as detailed further below.

21.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States within the Department of the Interior. FWS is vested with the authority and duty to protect and restore populations and habitats of ESA-listed threatened and endangered species, including bull trout. FWS issued the Biological Opinion for the Sage Hen Project in January 2021.

22.     Each violation of law, as alleged herein, injures the aesthetic, commercial, conservation, scientific, recreational, educational, fish and wildlife preservation, and/or other interests of ICL and its staff, supporters, and members. These are actual, concrete injuries caused by Defendants' violations of law, and the judicial relief sought would remedy, in whole or in part, ICL's injuries.

23.     ICL's interests have been, are being, and will continue to be irreparably injured and harmed by Defendants' actions challenged herein. Unless the relief prayed for is granted, ICL and the public will suffer irreparable harm and injury to its legally protected interests.

## LEGAL BACKGROUND

**The National Environmental Policy Act**

24.     Congress adopted NEPA to "encourage productive and enjoyable harmony between man and his environment," and "to promote efforts which will prevent or eliminate damage to the environment and biosphere," among other stated purposes. 42 U.S.C. § 4321.

25.     As the Supreme Court has emphasized, NEPA requires federal agencies to take a "hard look" at likely environmental impacts before approving an action, not afterward. *See Baltimore Gas & Electric v. NRDC*, 462 U.S. 87, 97 (1983). "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

26.     The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. §§ 1500 *et seq.*[2]

27.     NEPA's goals are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c). The NEPA process requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). The information agencies are required to gather and disclose during the NEPA process "must be of high quality." *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

28.     Under NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must include, *inter alia*, a detailed statement of: (1) the environmental effects—including direct, indirect, and cumulative effects—of the proposed action; (2) any adverse environmental effects that cannot be avoided if the proposed action is implemented; (3) reasonable alternatives to the proposed action; and (4) mitigation measures to minimize any significant effects identified. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.10, 1502.14, 1502.16.

---

[2] The Council on Environmental Quality (CEQ) adopted NEPA regulations binding on every federal agency. *See* 40 C.F.R. Part 1500. The Forest Service approved the Sage Hen Project using the 1978 CEQ NEPA regulations (as amended), which are cited in this Complaint, not the 2020 CEQ NEPA regulations.

29.     To determine whether potential adverse effects are significant enough to warrant

an EIS, the agency may prepare a more concise Environmental Assessment (EA). 40 C.F.R.

§ 1508.9(a). An EA must "provide sufficient evidence and analysis for determining whether to

prepare an environmental impact statement or a finding of no significant impact." *Id*. §

1508.9(a)(1). An agency may avoid an EIS only if it finds, after preparing an EA, that the action

will have "no significant impact," in which case the agency may issue a Finding of No

Significant Impact (FONSI). *Id*. §§ 1501.4(b), 1508.9 & 1508.13. An EA and FONSI must

provide a "convincing statement of reasons" why the project's impacts are insignificant. *Id.*

30.     In evaluating the "significance" of an environmental impact for purposes of

determining whether an EIS is required, federal agencies must consider, among other factors: (1)

Both beneficial and adverse impacts, as "[a] significant effect may exist even if the federal

agency believes that on balance the effect will be beneficial."; (2) "The degree to which the

effects on the quality of the human environment are likely to be highly controversial."; (3) "The

degree to which the possible effects on the human environment are highly uncertain or involve

unique or unknown risks."; (4) "The degree to which the action may establish a precedent for

future actions with significant effects . . . ."; (5) "Whether the action is related to other actions

with . . . cumulatively insignificant impacts . . . ."; (6) "The degree to which the action may

adversely affect an endangered or threatened species or its habitat . . . ."; and (7) "Whether the

action threatens a violation of federal, state, or local law or requirements imposed for the

protection of the environmen*t." Id*. § 1508.27(b).

31.     The scope of NEPA review is quite broad. Federal agencies must, among other

things, analyze all direct, indirect, and cumulative effects of a proposed action and its

alternatives on ecological, aesthetic, historic, cultural, economic, social, and health interests. *Id*.

§§ 1508.7, 1508.8. Direct effects include those that "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects result from incremental impacts of the action when added to all other past, present, and reasonably-foreseeable future actions regardless of what agency or person undertakes such other actions. *Id.* § 1508.7.

32.     The consideration of alternatives is at the heart of NEPA review. Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"; "[d]evote substantial treatment to each alternative considered in detail including the proposed action"; and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." *Id.* § 1502.14(a)–(c). Agencies must consider alternatives in an EA. *Id.* § 1508.9(b).

**The National Forest Management Act**

33.     NFMA requires the Forest Service to prepare a land and resource management plan ("forest plan") for each national forest, including standards and guidelines for how the forest shall be managed. 16 U.S.C. §§ 1604(a), (e) & (g)(3)(B). NFMA and its implementing regulations require that all management actions must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

34.     The governing forest plan for the Sage Hen Project is the Boise National Forest Land and Resource Management Plan, as amended in 2010 (hereafter, the "Forest Plan" or "Boise Forest Plan"). The Forest Plan includes numerous goals, objectives, guidelines, and standards to benefit and protect plants, fish, wildlife, and their habitat. "Standards are binding limitations placed on management actions," and a "project or action that varies from a relevant

standard may not be authorized unless the Forest Plan is amended." *Boise Forest Plan*, p. III-3. "Guidelines represent a preferred or advisable course of action generally expected to be carried out," and while "[d]eviation from compliance does not require a Forest Plan amendment," the "rationale for deviation should be documented in the project decision document." *Id.*

35.     Among other standards and guidelines, the Forest Plan includes guidelines calling for identifying habitat and surveying for the presence of "sensitive species" of wildlife and plants during project planning, as well as related standards to protect these sensitive species.

36.     Sensitive species are those species identified by the Regional Forester for which population viability is a concern on National Forest lands within the region. The goal of the Forest Service Sensitive Species Program (Forest Service Manual 2670) is to ensure that species numbers and population distribution are adequate so that no ESA-listing will be required and no extirpation will occur on National Forest lands.

37.     For sensitive wildlife, Forest Plan guideline "WIGU05" provides: "Source habitat should be determined for Sensitive wildlife species within or near the project area during site/project scale analyses. Surveys to determine presence should be conducted for those species for which source habitat is identified." *Id.* at III-28. Forest Plan standard "WIST03" requires: "Mitigate management actions within known nesting or denning sites of sensitive species if those actions would disrupt the reproductive success of those sites during the nesting or denning period. Mitigation measures shall be determined during project planning." *Id.* at III-27. Forest Plan standard "WIST05" requires: "In goshawk territories with known active nest stands, identify alternate and replacement nest stands during project-level planning when it is determined that the proposed activity is likely to degrade nest stand habitat." *Id.*

38.     For sensitive plants, Forest Plan guideline "BTGU01" provides: "For site/project-

scale analysis, suitable habitat should be determined for Sensitive species within or near the

project area. Conduct surveys for those species with suitable habitat to determine presence.

Document the rationale for not conducting surveys for other species in the project record." *Id.* at

III-36. Forest Plan standard "BTST01" requires: "Management actions that occur within

occupied sensitive plant species habitat must incorporate measures to ensure habitat is

maintained where it is within desired conditions, or restored where degraded." *Id.* at 35.

**The Endangered Species Act**

39.     Congress enacted the ESA "to provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved [and] to provide a

program for the conservation of such . . . species." 16 U.S.C. § 1531(b). The "heart of the ESA"

is the Section 7 consultation requirement. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472,

495 (9th Cir. 2011). Section 7 imposes a substantive duty on each federal agency to "insure that

any action . . . is not likely to jeopardize the continued existence of any endangered species or

threatened species or result in the destruction or adverse modification of habitat of such species."

16 U.S.C. §1536(a)(2). "Action" is defined broadly as "all activities or programs of any kind

authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02.

40.     The purpose of consultation is to ensure the action at issue "is not likely to

jeopardize the continued existence of any endangered species or threatened species or result in

the destruction or adverse modification of [designated critical] habitat of such species." 16

U.S.C. § 1536(a)(2). An action will cause jeopardy if it "reasonably would be expected, directly

or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50

C.F.R. § 402.02.

41.     During consultation FWS must "review all relevant information" regarding the action area, whether provided by the action agency or not. *Id*. § 402.14(g)(1). FWS must evaluate both the current status of listed species and critical habitat in the action area, as well as the effects of the proposed action and cumulative effects on listed species and critical habitat. *Id.* § 402.14(g)(2)–(3). Then, based on this information, FWS must issue a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). If the biological opinion concludes that the action will not result in jeopardy, FWS must provide an "incidental take statement" specifying the impact of such incidental taking on the species, any "reasonable and prudent measures" that FWS considers necessary to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the agency to implement those measures. 16 U.S.C. § 1536(b)(4).

42.     In carrying out consultation, "each agency shall use the best scientific . . . data available." 16 U.S.C. § 1536(a)(2). Mitigation measures relied on in a biological opinion must be reasonably specific, binding, certain to occur, and capable of implementation. *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743–48 (9th Cir. 2020).

43.     The term "take" includes to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). FWS further defines "harass" to include "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. And "harm" is defined to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

44.     Under ESA Section 7(a)(2), the action agency, like the Forest Service here, also must independently ensure that its actions do not result in jeopardy or adverse modification of critical habitat. *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987); *Defenders of Wildlife v. Martin,* 454 F. Supp. 2d 1085, 1096–99 (E.D. Wash. 2006). As the Ninth Circuit has held: "Consulting with the Service alone does not satisfy an agency's duty under the Endangered Species Act. An agency cannot 'abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a Service biological opinion must not have been arbitrary or capricious.'" *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994). Thus, an action agency cannot meet its substantive obligations under Section 7 of the ESA by relying on a biological opinion that is legally flawed. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).

45.     Without a legally adequate biological opinion and incidental take statement, any activities likely to result in incidental take of members of a listed species are unlawful. 16 U.S.C. § 1538(a)(1)(B). Accordingly, anyone who undertakes such activities, or who authorizes such activities, *id.* § 1538(g), may be subject to criminal and civil federal enforcement actions, as well as civil actions by citizens or others for declaratory and injunctive relief. *See id.* § 1540.

**The Administrative Procedure Act**

46.     The APA empowers federal courts to hold unlawful and set aside any final agency action which is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

## STATEMENT OF FACTS

**Sage Hen Project Overview**

47.     The Sage Hen Project would occur on approximately 68,000 acres of public lands on the Emmett Ranger District of the Boise National Forest in the West Mountains in Gem and Valley Counties, Idaho. The Project area includes parts of the Snowbank Inventoried Roadless Area and includes the entire Upper Squaw Creek watershed.

48.     The Project area is home to many special-status fish, wildlife, and plant species and habitat. It is also a popular area for camping, fishing, hiking, hunting, and other recreation.

49.     The Project authorizes up to 19,900 acres of commercial timber harvest, 11,200 acres of fuels reduction, 35,000 to 45,000 acres of prescribed burning, and 83.1 miles of road construction over the next twenty years. It also authorizes removing and replacing culverts and resurfacing and maintaining roads.

50.     The Forest Service is using "condition-based management" for the Sage Hen Project, so the Forest Service has not determined exactly where, when, or how authorized activities will occur and will decide that later. As stated in the Decision Notice (DN) approving the Project, this "allows managers to make landscape-level decisions while reserving flexibility and the ability to respond to change before implementing management activities." The DN also asserts that it used a "conservative maximum impact analysis approach" for the Project.

51.     The Forest Service anticipates that there will be 13 to 18 timber sale contracts within the Project area, as illustrated in Figure 2 below, which depicts potential locations of logging areas and roads. Contracts would typically be 5 years in length. Implementation of timber sale activities would occur over a 10- to 15-year timeframe, starting in 2021. Upon completion, road rehabilitation, burning, and other activities would occur over additional years.

**Figure 2. – Map of Potential Timber Sale Areas and Roads**
(reproduction of Fig. 1 in the Forest Service's Decision Notice)

**Forest Service Approval Process**

52.     Since 2012, the Forest Service and Boise Forest Coalition participated in field trips and meetings related to potential projects in the Sage Hen area. The Boise Forest Coalition is a citizen-led group open to anyone with an interest in Boise National Forest management. Members of the Boise Forest Coalition Steering Committee include representatives of ICL, the local Soil Conservation District, the Society of American Foresters, and Woodgrain (a timber product company), as well as a private citizen.

53.     In April 2020, the Forest Service initiated the "scoping period" for the Sage Hen Project, announcing the rough sketches of the proposed action and soliciting public comment. From that point on, the Forest Service rushed the Project to approval, minimizing public involvement, repeatedly rebuffing ICL's efforts to engage, and ignoring warnings of the Forest Service's impending legal violations.

54.     In May 2020, ICL submitted scoping comments. ICL noted that it supported components of the Project; however, ICL warned the Forest Service that authorizing such a large project by using an EA instead of a full EIS would violate NEPA. ICL identified five recent projects in the Payette National Forest where the Forest Service used EISs to evaluate landscape-scale projects similar to Sage Hen. ICL also urged the Forest Service to consider multiple action alternatives and utilize maximum public participation to comply with NEPA.

55.     The Boise Forest Coalition also submitted scoping comments, warning that the scoping documents failed to provide sufficient information to fully understand the proposed action and its potential effects, among other concerns. The Idaho Department of Parks and Recreation raised concerns about recreation access, opportunities and improvements, and asked the Forest Service to consider an alternative. Other conservation groups and citizens submitted

comments as well, including comments raising concerns about the large scale of the Project and its likely adverse effects to fish, plants, and wildlife.

56.     By letter dated September 8, 2020, ICL urged the Forest Service to take public comment on a Draft EA, instead moving straight to a Final EA without further public comment.

57.     Without taking further public comment, the Forest Service released the Final Environmental Assessment and Finding of No Significant Impact (the EA/FONSI) and the Draft Decision Notice on November 12, 2020, triggering the Forest Service's administrative objection period. The EA did not consider any action alternatives; it only considered the Forest Service's proposal or taking no action. The FONSI asserted that the Project will not have any significant environmental impacts, downplaying any adverse effects as small and short-term, despite the Project's large scale and the many unknowns due to using conditions-based management.

58.     By letter dated November 17, 2020, ICL warned the Forest Service that it would violate NEPA if it bypassed three essential components to such a large project: (1) preparing a full EIS; (2) developing alternatives; and (3) disclosing specific Project details.

59.     On December 26, 2020, ICL submitted objections. Again, ICL noted that it supports components of the Project but objected to the Forest Service's failure to prepare an EIS, failure to consider alternatives, and failure to disclose Project details. ICL objected to the FONSI, pointing out that the Forest Service's wildlife report acknowledges the Project's logging, burns, and road construction will cause severe, long-lasting impacts to habitat for multiple sensitive wildlife species. ICL also warned of the potentially significant risks to threatened bull trout from logging and road work. ICL also objected to the Forest Service's failure to conduct surveys and develop mitigation measures for fish, wildlife, and plants prior to Project approval. ICL also objected to the improper way the Forest Service used conditions-based management

here, making the true extent of the Project's environmental impacts unknown, highly uncertain, and highly controversial.

60.     The Boise Forest Coalition also filed objections, objecting to the Forest Service's refusal to develop any action alternatives, the lack of detail in the EA, the lack of opportunity for meaningful public comment, and the risk of impacts to fish and wildlife. Objections were filed by other conservation groups and members of the public too, raising similar and additional concerns about effects to fish, wildlife, recreation, and other values.

61.     On April 14, 2021, the Forest Service signed a Decision Notice (DN) authorizing the Sage Hen Project based on the EA/FONSI, thus refusing to prepare an EIS and denying ICL's and other entities' objections. In the DN, the Forest Service decided to drop commercial logging in a few limited areas but still authorized extensive logging, prescribed burning, and road construction and claimed all effects would be insignificant without considering any alternatives.

**Defects in Sage Hen Project EA/FONSI and DN**

62.     In the EA/FONSI, the Forest Service considered only two alternatives: the agency's proposed action and a "no action" alternative. The Forest Service refused to consider any action alternatives, despite being urged to do so by ICL and others. It never considered alternatives to reduce the scale of logging and road work or to otherwise reduce impacts to plants, fish, and wildlife. It also never considered alternatives to address additional recreation issues or additional watershed restoration measures.

63.     The potential impacts of the Project are largely uncertain and unknown due to the "conditions-based management approach" the Forest Service used. This leaves specific details—like where, when, and what type of logging and road activities will occur—to be decided later while the Project is underway, outside of the public NEPA process. This approach lets the Forest

Service do as it wishes for the next twenty years, as long as it stays within the maximum amounts of logging, road work, and other activities authorized.

64.     Those maximum amounts are massive and pose significant environmental impacts. Even after dropping a few particularly harmful areas of commercial logging and road work from the Project, the Forest Service still authorized up to 19,900 acres of commercial timber harvest, 11,200 acres of fuels reduction, 35,000 to 45,000 acres of prescribed burning, and 83.1 miles of road construction. It is well-established that logging and road construction can adversely affect fish, wildlife, and plants in many ways, and that those effects can be significant. But the EA/FONSI and DN improperly downplay or ignore these effects.

65.     The Project area watershed is home to bull trout, a native fish species listed as threatened under the ESA due to population and habitat declines and the risk of becoming endangered. The EA includes three paragraphs on water quality and one paragraph on bull trout, which acknowledge the Project could deliver increased sediment to area streams and otherwise harm bull trout. But in the EA/FONSI, the Forest Service claims the Project would "produce a long-term trend towards less sediment input than the existing condition."

66.     Absent from the EA/FONSI is information found elsewhere in the Project record which undermines the Forest Service's conclusions about bull trout. For example, bull trout abundance in the Project area is unknown but is likely extremely small. Bull trout appear to have been extirpated from some Project area streams in recent years. Livestock grazing and water diversions in the Project area have been and are expected to continue degrading bull trout habitat. Bull trout in the watershed have been identified as particularly susceptible to population decline and habitat loss due to climate change over the next two decades.

67.     The Forest Service also failed to disclose and address in the EA/FONSI

information in the Project record showing that the "long-term" benefits which the Project might have could be 15 or more years away. The record also shows any Project benefits are extremely modest, are mostly outside of populated bull trout areas, and would not correct the "functioning at unacceptable risk" status for sediment/turbidity in each of the three sub-watersheds in the area.

68.     In addition to failing to consider important information about bull trout populations and ongoing threats in the Project area, the Forest Service failed to consider important details about the Project and its likely adverse effects to bull trout. For example, the EA and its supporting documents fail to disclose the location, number, duration, timing, method, and other important details of logging truck crossings of occupied bull trout streams, and fail to discuss or consider any alternatives or mitigation measures.

69.     The Sage Hen Project area also includes habitat for twelve "sensitive species" of wildlife, three wildlife "management indicator species," and other special-status wildlife species. However, the EA includes only a one-paragraph discussion of effects to wildlife.

70.     Though never mentioned in the EA/FONSI or DN, elsewhere in the Project record the Forest Service's analysis confirms that logging, prescribed burns, and road work will disturb wildlife and eliminate or degrade huge swaths of habitat for decades to come. For example, sensitive and management indicator species that depend on mature forest habitat, including fisher, northern goshawk, boreal owl, pileated woodpeckers, and black-backed woodpecker, will lose 50% or more of their habitat. That habitat will not return for 50 years.

71.     The Project record also shows other special-status species with habitat and known or potential occurrence in the Project area will be harmed by logging and road activities, including: wolf and wolverine, which are both sensitive species; lynx, which is a threatened species; and elk and deer, which are "special interest species" in the area.

72.     For many wildlife species, the Forest Service approved the Project without

considering important baseline information. The Forest Service failed to survey for the presence

of individuals and/or identify important sites like nests, dens, and rendezvous areas for fisher,

boreal owl, northern goshawk, and gray wolf, even though these species are known or suspected

to likely inhabit the Project area. Instead, the Forest Service might conduct these surveys later

after the Project is underway.

73.     Despite the likely adverse effects, and despite the lack of baseline information, the

EA/FONSI and DN claim there will be no significant adverse effects to wildlife.

74.     The Project area also includes habitat for sensitive species of plants, including

whitebark pine, Sacajawea's bitterroot, seven devil's onion, Bryum moss, and least phacelia. On

December 2, 2020, FWS proposed to list the whitebark pine as a threatened species under the

ESA. 85 Fed. Reg. 77,408 (Dec. 2, 2020).

75.     In the EA/FONSI, the Forest Service admitted logging, road construction,

prescribed burning, and other activities may harm sensitive plants and degrade their habitat. But

it approved the Sage Hen Project without knowing where sensitive plants or their habitats are

located. And instead of evaluating the maximum potential adverse impacts, the Forest Service

assumed the Sage Hen Project will avoid all adverse impacts to sensitive plants.

76.     These likely adverse effects to fish, wildlife, and plants are amplified by the

additive effects from climate change, livestock grazing, water diversions, and other ongoing

activities in the area. The Forest Service acknowledged these cumulative effects in the Project

record. But it wholly failed to consider them in the EA/FONSI where it claimed there will be no

significant impacts. Even where it acknowledged these effects in the Project record, the Forest

Service failed to provide the quantified or detailed information necessary to understand the

cumulative impacts of other activities together with the impacts from the Sage Hen Project.

77.    For all of these likely adverse effects to fish, wildlife, and plants, the Forest Service relied on "project design features" (PDFs) and other avoidance, minimization, and mitigation measures to claim impacts will be insignificant. But many of the PDFs and other mitigation measures are vague, uncertain to occur, and have unknown effectiveness. Important mitigation measures have not yet been identified and will be decided later after the Project is underway. For example, the EA botanical resources section states: "Design features BT-1 and BT-2 require implementation surveys and development of mitigation measures to protect Region 4 Sensitive plant species when found" later while the Project is underway. Similarly, many fish and wildlife PDFs will be developed post-approval and outside of the public NEPA process.

78.    Even for mitigation measures developed during the NEPA process, many lack analytical data or analysis to support whether and to what degree they will effectively avoid, minimize, or compensate for the Project's potentially significant adverse effects.

**Bull Trout and Forest Service Consultation with FWS**

79.    Bull trout was listed as a threatened species in 1999. 64 Fed. Reg. 58910 (1999). The Sage Hen Project area is in the Upper Squaw Core Area (hereinafter the "Core Area"), which is one of 22 core areas in the Upper Snake Recovery Unit for bull trout. The Core Area is now isolated from other core areas and contains only "resident" bull trout. The Core Area is listed as having four resident populations of bull trout, all of which are within the Project area. However, only two of the four resident populations were documented during recent surveys.

80.    As depicted in Figure 3 below, many Project area streams are designated critical habitat, suitable habitat, and/or occupied habitat for bull trout. However, the Forest Service's most recent sampling detected bull trout in only a small portion of these areas.

**Fig 3. Aquatics Map**
(reproduction from Forest Service's Biological Assessment, App'x D)



81.     Primary threats to bull trout in the Core Area include upland riparian land management (livestock grazing), connectivity impairment, and nonnative fishes (predation, competition, and hybridization). Additionally, all three sub-watersheds in the Project area are functioning at "unacceptable risk" for sediment/turbidity metrics.

82.     For the Sage Hen Project, the Forest Service prepared a Biological Assessment for bull trout. On November 13, 2020, the Forest Service submitted the Biological Assessment to FWS and requested initiation of formal consultation under ESA Section 7. The Forest Service updated and re-transmitted the Biological Assessment to FWS on November 16, 2020. In the Biological Assessment, the Forest Service determined the Project may affect and is likely to adversely affect bull trout and its critical habitat, including from stream dewatering and fish handling during culvert replacements and from sediment delivery. The Forest Service also found road construction and use, culvert replacements, and timber harvest would affect bull trout.

83.     In January 2021, FWS issued the *Biological Opinion for the Sage Hen Integrated Restoration Project*, 01EIFW00-2020-F-0174 (Jan. 6, 2021) (hereinafter, the "Biological Opinion"). FWS determined the Project's vegetation management, road, and culvert activities are "expected to have temporary, negative effects via sediment/turbidity" and are "expected to alter juvenile and adult bull trout behavior and may cause temporary injury." FWS also determined that the removal of culverts in bull trout habitat "may result in the mortality or injury of bull trout juveniles or adults due to electroshocking and instream construction." FWS estimated fish salvage could result in 24 bull trout being captured and handled and experiencing sub-lethal effects with up to 14 bull trout mortalities." FWS acknowledged that 14 bull trout mortalities "will reduce the population size, the number of available spawners, and genetic diversity within resident populations."

84.     However, in the Biological Opinion, FWS concluded that the Project will not jeopardize the continued existence of bull trout and will not destroy or adversely modify its designated critical habitat. The Biological Opinion also includes an Incidental Take Statement for expected take of bull trout that will occur during the culvert replacements.

**Defects in FWS's Biological Opinion for Bull Trout**

85.     In its Biological Opinion, FWS ignored important information and made numerous unsupported assumptions about the Sage Hen Project's adverse effects to bull trout and its habitat.

86.     First, FWS assumed larger, more stable bull trout populations exist in the Project area than is supported by the information presented. FWS stated in the Biological Opinion that "current population estimates are unknown" but that in 2008 around 250 to 1,000 bull trout were estimated to inhabit the Core Area. Throughout the Biological Opinion, FWS assumed there is still—thirteen years later—a population of 250 to 1,000 bull trout despite information undermining that assumption.

87.     Since at least 2008, FWS has classified the Core Area as "high risk," which it defines as an "area at high risk because of extremely limited and/or rapidly declining numbers, range, and/or habitat, making the bull trout in this core area highly vulnerable to extirpation." FWS, *Bull Trout (Salvelinus confluentus) 5-Year Review: Summary Evaluation* (2008). As admitted in the Biological Opinion, bull trout and habitat in the Core Area have been and are being harmed by climate change, livestock grazing, habitat fragmentation, non-native fish, water diversions, and other cumulative effects. Additionally, while the Core Area was previously believed to support four local populations of bull trout, FWS now believes two of those populations have been extirpated. Furthermore, in one of the two local populations that still

exists (in the Third Fork sub-watershed), the Forest Service's recent eDNA sampling had only a single positive detection; the other samples were all negative (*see* Fig. 3 above).

88.     Second, FWS assumed the Project would last only ten years and based its analysis and conclusions on this assumption. However, the Forest Service's Biological Assessment states that the Project will last "twenty years," or until about 2041. Project documents confirm that the Forest Service expects timber harvest to take roughly ten to fifteen years to complete, and that it will take additional years to reclaim roads, conduct burns, and complete other activities.

89.     By cutting the Project timeframe in half, FWS dismissed any synergistic effects the Project will have with climate change and other cumulative effects that are already harming bull trout and that will continue to harm bull trout in the decades to come. For example, with respect to climate change, FWS said modeling shows suitable bull trout habitat in the Core Area will be "greatly reduced" by 2040. But FWS determined it could ignore these severe climate change effects since the Project will conclude within ten years. FWS made similar mistakes with respect to other ongoing, cumulative effects, including effects from improper livestock grazing, water diversions, and non-native fish.

90.     Third, even if the Project is completed in less than twenty years, such as within ten years (as FWS mistakenly expected), FWS arbitrarily dismissed the combined effects of the Project together with cumulative effects harming bull trout over the next ten years. In light of the poor conditions and troubling trends already present in this high-risk Core Area, ten years is far from insignificant. For example, with respect to climate change, FWS determined that from 2020 to 2040 climate change will result in "greatly reduced" suitable habitat in the Core Area. But since FWS claims the Project will be completed within 10 years (by roughly 2031), it assumed climate change is not expected to contribute to effects along with the Project, without saying

anything about how much suitable habitat will be lost by 2031. FWS made similar mistakes with respect to other ongoing, cumulative effects and their combined effects with the Project.

91.     Fourth, streams in the Project area are "functioning at unacceptable risk" for sediment/turbidity, and FWS admitted in the Biological Opinion that the Sage Hen Project, while it is underway, will generate and deliver sediment to streams, primarily from road activities. FWS also admitted that sediment can harm bull trout and degrade habitat in numerous ways. But FWS dismissed the sediment impacts by repeatedly stating that in the long-term, after the Project is complete, sediment delivery rates will fall to below pre-project levels.

92.     However, the Forest Service's sediment modeling, which FWS relied on in the Biological Opinion, shows that most of the projected improvements in sediment delivery would occur in the Second Fork sub-watershed, where bull trout are already extirpated. Considering the streams where bull trout are or may still be present, the sediment modeling shows that sediment levels will remain essentially the same in the long term as they are today. The modeling also shows sediment will get worse in the long term some streams where bull trout may be present.

93.     Fifth, FWS downplayed and dismissed the supposedly "short-term" sediment impacts that will occur while the Project is underway. Again, FWS admitted in the Biological Opinion that the Sage Hen Project will cause additional sediment to enter streams throughout the Project area. In fact, the Forest Service expects so much sediment that aquatic life beneficial uses might not be met in the Third Fork sub-watershed and in mid and lower reaches of the Squaw-Pole sub-watershed. These are the only two sub-watersheds in the Core Area that still have documented bull trout populations. But FWS dismissed this as "short term" and unimportant, even though bull trout are already in a precarious state, watersheds are already functioning at "unacceptable risk" due to sediment/turbidity, and habitat conditions are on the decline.

94.     Sixth, FWS ignored the construction, maintenance, and use of road stream crossings in the Biological Opinion. With the exception of the four locations where the Forest Service might install new culverts to improve aquatic organism passage, the Biological Opinion fails to even address stream crossings. Constructing, maintaining, and using roads at stream crossings is known to cause many direct and indirect harmful impacts to bull trout and bull trout habitat, through sediment delivery, streambank and streambed alterations, and other effects.

95.     To access some logging units, the Forest Service authorized logging trucks to ford Squaw Creek in an area likely occupied by bull trout. *See* Figure 4 below. However, in the Biological Opinion, FWS failed to even acknowledge this live stream fording, let alone evaluate and protect against its adverse effects.

**Fig. 4. June 7, 2021 Photograph of Creek Ford Approved by Forest Service to Access "618C" Road Network and Logging Units in "Second Fork Slope" Timber Sale Area**



96.     Seventh, throughout the Biological Opinion, FWS relied on the PDFs and other mitigation that the Forest Service identified in the Biological Assessment. FWS failed to consider that many of these PDFs are nonbinding and highly uncertain to occur under the "conditions-based management" approach the Forest Service employed. Furthermore, many of the PDFs are so vague and non-specific that even when they do apply to a particular activity, there is still no basis for FWS to reasonably rely upon them.

97.     For example, PDF "SW-6", which may apply to some road and timber harvest activities, instructs: "Install erosion control where necessary and appropriate to minimize sediment delivery to streams from road and management activities, including temporary roads and landings." Nowhere in PDF SW-6 does the Forest Service specify when it is "necessary and appropriate" to install erosion control or what erosion control measures must be installed, and nowhere does it specify what it means to "minimize" sediment delivery.

98.     Eighth, FWS's Incidental Take Statement in the Biological Opinion addresses take caused only by the Project's four culvert replacements and does not address incidental take caused by other Project activities. In the Biological Opinion, FWS concluded that increases in sediment may result from "vegetation management, road, and [culvert replacement] activities, which are expected to alter juvenile and adult bull trout and cause temporary injury." The Forest Service's sediment modeling, which FWS relied on, shows that road activities, timber harvest, and other Project activities will cause elevated sediment at levels high enough to harm and harass bull trout. Stream crossings like the live ford discussed above could directly kill and will likely harm or harass bull trout. But FWS never included these causes of take in the Incidental Take Statement, and FWS failed to include reasonable and prudent measures and terms and conditions to minimize such take, ensure against jeopardy, and set a trigger for reinitiation of consultation.

## FIRST CLAIM FOR RELIEF:
### Forest Service NEPA & APA Violations:
### Failure to Prepare EIS

99.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

100.    This claim challenges the Forest Service's violations of NEPA and NEPA's implementing regulations by authorizing the Sage Hen Project without preparing an EIS. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

101.    NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To avoid preparing an EIS, an agency must set forth a "convincing statement of reasons" explaining why the action will have no significant environmental impact. 40 C.F.R. § 1508.13.

102.    As alleged above and will be further presented in briefing, the Forest Service failed to set forth a convincing statement of reasons in the EA/FONSI that there will be no significant effects; and the EA/FONSI is not supported by the facts, fails to consider important factors, and is otherwise arbitrary and capricious. Numerous significance factors from the CEQ NEPA regulations, as identified in Plaintiff's and other public comments and administrative objections, underscore that the Sage Hen Project may have significant impacts and, thus, requires preparation of an EIS. These include, but are not limited to, the following:

A.      The large-scale, long-term, and extensive amount of approved activities— including over 80 miles of road construction, around 18,000 acres of commercial logging, and other activities—which pose significant direct, indirect, and cumulative effects to forests, streams, wildlife, fish, and plants.

B.      The highly controversial, unknown, and/or uncertain and potentially significant direct, indirect, and cumulative impacts to forests, streams, fish, wildlife, and plants due to the

"conditions-based management" approach under which specific Project details and mitigation measures will be decided on later, and environmental information will be gathered later.

      C.      The highly controversial, unknown, and/or uncertain and potentially significant direct, indirect, and cumulative impacts to forests, streams, fish, wildlife, and plants due to information the Forest Service failed to gather, effects it failed to consider, and other ways it failed to take a hard look.

      D.      The adverse effects to "threatened" bull trout and bull trout critical habitat.

      E.      The threat of violations of NFMA and the ESA.

      103.     Because the Forest Service violated NEPA's requirements by approving the Sage Hen Project through an inadequate DN and EA/FONSI instead of preparing an EIS, its action is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA, which has substantially prejudiced Plaintiff, and accordingly must be held unlawful and set aside under 5 U.S.C. § 706(2).

      WHEREFORE, Plaintiff prays for relief as set forth below

**SECOND CLAIM FOR RELIEF:**
**Forest Service NEPA and APA Violations:**
**Failing to Consider Reasonable Range of Alternatives**

      104.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

      105.     This claim challenges the Forest Service's violations of NEPA and NEPA's implementing regulations by authorizing the Sage Hen Project without considering a reasonable range of alternatives required by NEPA. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

106.    As alleged above and will be further presented in briefing, the Forest Service

failed to consider a reasonable range of alternatives. In the EA, the Forest Service considered

only the proposed action and a no action alternative. Plaintiff and other commentors and

objectors urged the Forest Service to consider other feasible alternatives to the proposed action,

such as a reduced road alternative, a recreation alternative, and others. But the Forest Service

refused to consider any action alternatives.

107.    The Forest Service's approval of the Sage Hen Project through the DN and

EA/FONSI is thus arbitrary, capricious, an abuse of discretion, not in accordance with the law,

without observance of procedure required by law, and/or in excess of statutory jurisdiction,

authority, or limitations within the meaning of the judicial review provisions of the APA, which

has substantially prejudiced Plaintiff, and accordingly must be held unlawful and set aside under

5 U.S.C. 706(2).

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF:
**Forest Service NEPA & APA Violations:**
**Failure to Take a Hard Look**

108.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

109.    This claim challenges the Forest Service's violations of NEPA and NEPA's

implementing regulations by authorizing the Sage Hen Project based on the defective EA

without taking a "hard look" at potential environmental impacts as required by NEPA. Plaintiff

brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

110.    Under NEPA, agencies must take a hard look at the direct, indirect, and

cumulative effects of its proposed action and all alternatives in an EA. 40 C.F.R. § 1508.7,

1508.8. A hard look must be taken before project approval, not later after the project has already

been approved. 40 C.F.R. § 1500.1(b)–(c). This requires utilizing accurate scientific analysis, including by utilizing up-to-date baseline information, and disclosing that information and analysis, and its limitations, to the public. *Id.*

111.    As alleged above and will be further presented in briefing, by deferring gathering baseline information, deferring the selection of Project activities, deferring the development and selection of mitigation measures, and through other errors, omissions, and unsupported assumptions in the Sage Hen Project EA/FONSI and DN, the Forest Service failed to take a hard look at the direct, indirect, and cumulative effects of the Sage Hen Project, including to many fish, wildlife, and plant species and their habitats.

112.    By relying on the defective EA/FONSI and DN, the Forest Service's action approving the Sage Hen Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA, which has substantially prejudiced Plaintiff, and accordingly must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF:
### Forest Service NFMA & APA Violations:
### Failure to Comply with Forest Plan

113.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

114.    This claim challenges the Forest Service's violations of the National Forest Management Act and NFMA's implementing regulations, by authorizing the Sage Hen Project without complying with provisions of the Boise Forest Plan. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

115.    NFMA requires federal agencies to ensure that their site-specific actions comply with the requirements of the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(E). The Boise Forest Plan includes guidelines requiring the Forest Service to identify suitable habitat and conduct surveys for the presence of "sensitive species" of fish, wildlife, and plants. It also includes standards requiring mitigation during project planning to protect special areas, such as wildlife nests and denning sites, and plant habitats.

116.    As alleged above and will be further presented in briefing, the Forest Service failed to comply with these guidelines and standards, in violation of NFMA, including by the following failures:

A.    Failing to identify suitable habitat and/or conduct surveys for fisher, boreal owl, Northern goshawk, whitebark pine, Sacajawea's bitterroot, seven devil's onion, Bryum moss, and least phacelia, and/or failed to explain why it did not do so, as required by Forest Plan guidelines WIGU05 and BTGU01.

B.    Failing to develop mitigation during project planning to mitigate impacts to nesting and denning sites for sensitive wildlife species (including fisher, boreal owl, wolf, wolverine, and lynx) as required by Forest Plan standard WIST03 and for goshawk as required by Forest Plan standard WIST05.

C.    Failing to incorporate measures to ensure occupied sensitive plant habitat is maintained or restored as required by Forest Plan standard BTST01.

117.    By failing to comply with the Boise Forest Plan, the Forest Service's action approving Sage Hen through the EA/FONSI and DN is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the

judicial review provisions of the APA, which has substantially prejudiced Plaintiff, and

accordingly must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiff prays for relief as set forth below.

### FIFTH CLAIM FOR RELIEF:
**Forest Service ESA Violations:**
**Reliance on Flawed Biological Opinion**

118.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

119.    This claim challenges the Forest Service's violations of the ESA and the ESA's

implementing regulations by authorizing the Sage Hen Project relying on the inadequate

Biological Opinion issued by FWS. Plaintiff brings this claim pursuant to the ESA citizen suit

provision, 16 U.S.C. §1540(g).

120.    The ESA requires action agencies, like the Forest Service here, to engage in

Section 7 ESA consultation with the consulting agency, like FWS here, to "insure" their actions

will not jeopardize the continued existence of ESA-listed species and will not destroy or

adversely modify their designated critical habitat. 16 U.S.C. §1536(a)(2). An action agency

cannot satisfy these duties by relying on a flawed biological opinion.

121.    As alleged above and will be presented to the Court, the Biological Opinion for

the Sage Hen Project is flawed in numerous ways and is arbitrary, capricious, an abuse of

discretion, and not in accordance with the law, within the meaning of the judicial review

provisions of the APA. In part, this is because the Forest Service's Biological Assessment was

flawed and failed to supply adequate information. By relying on the flawed Biological Opinion,

the Forest Service failed to insure the Project will not jeopardize the continued existence of bull

trout and will not destroy or adversely modify its designated critical habitat.

122.     By relying on the flawed Biological Opinion in its action approving the Sage Hen

Project, the Forest Service is in violation of ESA Section 7, and its action must be held unlawful

and set aside.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>SEVENTH CLAIM FOR RELIEF</u>:
**FWS ESA & APA Violations:**
**Inadequate Biological Opinion & Incidental Take Statement**

123.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

124.     This claim challenges the U.S. Fish and Wildlife Service's violations of the ESA

and the ESA's implementing regulations by issuing the Biological Opinion and Incidental Take

Statement for bull trout for the Sage Hen Project without considering important factors, without

reaching conclusions supported by the facts, and without being in accordance with law. Plaintiff

brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

125.     In a biological opinion, FWS must review all relevant information, evaluate the

current status of listed species and critical habitat in the action area, and assess the effects of the

proposed action and cumulative effects on listed species and critical habitat 50 C.F.R. §

402.14(g)(1)–(3). Then, FWS must decide whether the action, taken together with cumulative

effects, is likely to jeopardize the continued existence of listed species or result in the destruction

or adverse modification of critical habitat, and must provide an incidental take statement and

associated reasonable and prudent measures and terms and conditions to minimize the impact. *Id.*

§ 402.14(g)(4); 16 U.S.C. § 1536(b)(4).

126.     As alleged above and will be presented to the Court, FWS made numerous errors

and unsupported assumptions in the Biological Opinion and Incidental Take Statement, including

but not limited to the following:

A.      Ignoring relevant information on population abundance, and/or failing to account for the risk of extirpation given the low abundance of local populations;

B.      Erroneously assuming the Project would last only ten years, thereby assuming Project effects would end sooner and would not overlap with the severe longer-term effects of climate change and other cumulative effects;

C.      Ignoring information showing even in the next ten years, climate change and other cumulative effects may have severe overlapping effects with the Project;

D.      Assuming long-term Project-wide sediment reductions will help bull trout, when those reductions are modest and will occur in streams where there are no bull trout;

E.      Ignoring the effects of "short-term" sediment increases the Forest Service expects the Project to cause while it is underway;

F.      Failing to consider the effects of stream crossings, including log haul through at least one stream occupied by bull trout;

G.      Improperly relying on mitigation measures that are vague, are uncertain to occur, are unenforceable, and have uncertain effectiveness; and/or

H.      Failing to include in the Incidental Take Statement the likely take of bull trout caused by the Project other than take from the four culvert replacements, failing to minimize the effects of such other take through reasonable and prudent measures and terms and conditions, and failing to set a trigger for reinitiation of consultation from such other take.

127.    Each of these errors renders FWS's Biological Opinion and Incidental Take Statement for the Sage Hen Project arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review

provisions of the APA, which has substantially prejudiced Plaintiff, and accordingly must be held unlawful and set aside under the APA, 5 U.S.C. 706(2).

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Idaho Conservation League respectfully requests that this Court grant the following relief:

A.      Order, declare, and adjudge that the Forest Service's EA/FONSI and DN approving the Sage Hen Project are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA, NFMA, the ESA, and/or the APA;

B.      Vacate, set aside, reverse, and remand the Sage Hen Project EA/FONSI and DN;

C.      Order the Forest Service to prepare an EIS;

D.      Order, declare, and adjudge that FWS's Biological Opinion and Incidental Take Statement for the Sage Hen Project are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the ESA and APA;

E.      Vacate, set aside, reverse, and remand FWS's Biological Opinion and Incidental Take Statement;

F.      Order, declare, and adjudge the Forest Service to be in violation of the ESA for relying the Biological Opinion;

G.      Enter such temporary, preliminary, or permanent injunctive relief as Plaintiff may hereafter seek;

H.      Award Plaintiff its reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., the ESA, 16 U.S.C. § 1540(g)(4), and all other applicable authorities; and/or

I.      Grant such further and additional relief as the Court deems just and proper in

order to remedy Defendants' violations of law and protect Plaintiff and the public interest.

Dated this 20th day of December, 2021.        Respectfully submitted,

/s/ Bryan Hurlbutt
Bryan Hurlbutt (ISB #8501)
Laurence ("Laird") J. Lucas (ISB #4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

*Attorneys for Plaintiff Idaho Conservation League*